**NATIONAL STEEL CORPORATION**

v.

**The UNITED STATES.**

No. 422–66.

United States Court of Claims.

Dec. 12, 1969.

Collins, J., dissented.

William T. Hannan, Washington, D. C., attorney of record, for plaintiff. Hannan, Castiello & Berlow, Washington, D. C., and John E. Laughlin, Jr., and Thorp, Reed & Armstrong, Pittsburgh, Pa., of counsel.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant. John J. Kilgariff, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

Before us now on cross-motions for summary judgment is an action to recover alleged overpayments of income taxes collected from the taxpayer, Great Lakes Corporation, for the calendar years 1955–1957. Plaintiff, National Steel Corporation alleges it is successor by statutory merger to all claims and other assets of the taxpayer. Plaintiff says that pursuant to section 124A of the Internal Revenue Code of 1939, taxpayer was entitled to amortize certain costs incurred in the construction of an "emergency facility". The Government contends, *inter alia,* that since the disputed costs were not certified, as prescribed by section 124A and its corresponding regulations, the Commissioner of Internal Revenue was correct in refusing taxpayer's claimed deductions.

The pertinent facts are as summarized: At the outbreak of the Korean War, this nation's facilities to produce metallurgical coke and pig iron—essential raw materials for making steel—were inadequate to meet the burgeoning demands of war mobilization. Finding its own facilities similarly inadequate, taxpayer, an integrated producer of iron and steel products, decided to enlarge its plant with more blast furnaces and coke ovens.

Taxpayer desired to take advantage of the five year amortization privilege which the Congress originally fashioned as Internal Revenue Code of 1939, § 124, added by § 302, Second Revenue Act of 1940, ch. 757, 54 Stat. 974, amended § 155(a) Revenue Act of 1942, ch. 619, 56 Stat. 798, and which was reactivated for the Korean War by § 124A of the above Code. The purpose of these enactments was to answer a difficulty raised in the minds of businessmen by World War I experience, namely, that facilities added to the industrial plant to meet war needs would very likely be useless or nearly so when the emergency was over, but that the tax laws would often not provide any way to write them off when they were being used out of the profits they then would generate. The solution was to allow a tax deduction for amortization of any emergency facility over a five year period, or less, regardless of its actual economic life, whenever it was certified by the proper executive agency as "necessary in the interests of national defense."

This certification power was, as Mr. Justice Black points out in United States

v. Allen-Bradley Co., 352 U.S. 306, 309, 77 S.Ct. 343, 1 L.Ed.2d 347 (1957) an immense responsibility that had to be exercised with great discretion. The designated authority was duty bound not to certify more than what was essential, because, among other good reasons, revenue was also necessary to winning the war. If, from the taxpayer's point of view, amortization tended to allow a more realistic assessment of taxable income in the war period, from that of the tax gatherer it postponed the realization of some taxable income to a time after the emergency, when the facilities were fully amortized. To the extent that income tax rates were then lower and excess profits taxes no longer in effect, the lost revenue would never be regained and untaxed industrial profits would correspondingly be increased. At a time when hundreds of thousands were asked to sacrifice their lives, abuse of the certification power would have been an adverse moral factor of no little gravity. For this reason, the Supreme Court in *Allen-Bradley, supra,* held that the statutory provision, though ambiguous, was properly construed by the certifying agencies to allow them to certify a part of the cost of an emergency facility, and did not restrict them to all or none. That case involved a certification of the cost only up to a specified percentage.

Pursuant to section 124A, the taxpayer on November 20, 1950, filed with the National Security Resources Board (hereinafter NSRB), the original certifying authority under § 124A (Exec. Order No. 10,172, 15 Fed.Reg. 6929 (1950)), an application requesting a Necessity Certificate for 75 by-product coke ovens and related facilities. (Taxpayer had earlier filed a similar application seeking certification for additional blast furnaces, but the certificate issuing from this application is not in dispute). Reduced to its components, taxpayer's coke oven application asked certification for 12 acres of land (estimated at $720,000), buildings and other fixed installations (esti-

mated at $16,723,000), and miscellaneous items whose descriptions and costs are not in issue. The land "to be acquired" was identified only to the extent that it was located on Zug Island, River Rouge, Michigan, and situated next to taxpayer's proposed blast furnace site. No drawing was attached to the application form since none was then available. The category "Buildings and Other Fixed Installations" subdivided into (a) Preparing Site (estimated at $1,200,000) and (b) 75 By-Product Coke Ovens Complete with Auxiliary Equipment (estimated at $15,523,000). Although taxpayer did not elaborate as to the nature of the preparing site item, it did advise the NSRB generally that because work contracts had not been let yet, all costs given in the application were naturally approximate.

On December 9, 1950, the NSRB approved taxpayer's application with two limitations. It would not certify any of the cost of land acquisition and it would certify only 85% of the remaining estimated costs—$17,280,000. Acquiescing in this decision, taxpayer commenced to let contracts and more definitively plan the project. Taxpayer says it became apparent that the originally estimated 12 acres of land was inadequate to accommodate the bank of coke ovens. For the taxpayer, however, this raised no problem. In accordance with an agreement *predating* its certification application, taxpayer exchanged its 22.7936 acre plot for a 17.9036 acre plot owned by its neighbor, the Solvay Division of Allied Chemical and Dye Corporation (Solvay). Although this was the *same* land for which taxpayer had previously but unsuccessfully sought certification, a major cost discrepancy is not explained. In its application to the NSRB the taxpayer estimated the land to cost $720,000 or $60,000 an acre. In fact, however, taxpayer was obligated prior to the application to give, in full consideration for Solvay's acreage, a piece of land appraised by its own account at $40,258.97. Hence the actual cost to tax-

payer for Solvay's land was about $2,250 per acre. An unanswered question is what expenditures taxpayer may have originally intended to allocate to land acquisition.

Apparently taxpayer intended to integrate the new facilities with existing plant and therefore had a limited choice where to put them. Prior to its original application and perhaps long before its agreement with Solvay, taxpayer knew that the chosen land was covered solidly with thick layers of a valueless lime waste product dumped by Solvay. Removal of this waste was necessary before the usual foundation work could begin. It was also necessary, under the terms of the agreement with Solvay, for taxpayer to remove and relocate certain equipment and installations used by Solvay to dump this waste. These obligations, although *not* mentioned in the original application, made up the category and cost of site preparation. As removal operations began in May of 1951, the taxpayer realized that it had substantially underestimated its site preparation costs. This was true for several reasons: First, the lime waste was thicker and more difficult to remove than anticipated. Second, labor and material costs had risen. Third, the decision to use almost 50% more land proportionately increased the work and compounded the costs. These factors combined almost to triple the projected cost of site preparation. Moreover, the overall affect of the inflated labor and materials market was, as estimated by the taxpayer, an increase in the total project cost of more than $8,000,000.

Taxpayer's next action is explained by the following: On October 26, 1950, prior to taxpayer's original application, the NSRB issued regulations (hereinafter referred to as Regulation 1) governing the issuance and administration of Necessity Certificates under § 124A. (15 Fed.Reg. 7265 (1950), also published in 32A C.F.R., Chap. V, Reg. 1 (Rev. 1951)). Sections 3(h) and (i) of Regulation 1 read as follows:

*Necessity Certificates.* Upon issuance of a Necessity Certificate, it will be forwarded to the Commissioner of Internal Revenue and will constitute conclusive evidence of certification by the certifying authority that the facilities therein described are necessary in the interest of national defense to the extent certified. The certifying authority will not certify the accuracy of the cost of any facility or of any date relative to the construction * * * thereof. It will be incumbent upon taxpayers electing to take the amortization deduction to establish to the satisfaction of the Commissioner * * * the identities of the facilities, the costs thereof and the dates relative thereto.

*Further description after certification.* Where after the completion of a construction, * * * of an emergency facility, the taxpayer finds that the description or cost of any facility appearing in the Necessity Certificate materially varies from the actual description or cost of the facility, a statement may be filed by the taxpayer with the certifying authority setting forth the correct description or cost of the emergency facility actually constructed, * * *. A copy of the statement will be forwarded by the certifying authority to the Commissioner of Internal Revenue, provided the description or cost in the opinion of the certifying authority is within the scope of the original certification, and when so forwarded, the statement will have the effect of an amendment of the original certificate.

Prompted, but allegedly not compelled by these sections of Regulation 1, taxpayer, on November 26, 1951, filed with the Defense Production Administration (hereinafter DPA), NSRB's successor, a request for a scope amendment. (The term "scope amendment" was used by the parties to describe the effect of the certifying authority's approval of a "statement * * * setting forth the correct description or cost of the emergency facility.") Generally more com-

prehensive than the original application, the request for scope amendment detailed and itemized the operations and costs of site preparation:

| | |
|---|---:|
| Move Lime Waste | $2,593,955.00 |
| Changes to Solvay's Waste Lines | 387,593.00 |
| Move and Re-erect Cone Thickeners | 62,480.00 |
| Build New Dike For Waste | 82,500.00 |
| Change 42″ Gas Mains | 52,393.00 |
| Total | $3,178,921.00 |

Although the taxpayer, in addition to the above summary, told the DPA that one of the factors increasing the site preparation costs was "the necessity of removing a larger quantity of this material [lime waste] than originally anticipated * * * *.", absent from this statement was the admission that this additional waste removal was consequent to taxpayer's decision to use 50% more land space.

After receiving taxpayer's request for scope amendment but before deciding its fate, the DPA issued regulations revising Regulation 1 (hereinafter referred to as Revised Regulation 1) (32A C.F.R. Chap. I, Reg. 1 (Rev. 1953)). Sections 3(j) (1) and (2) which are relevant to this case are set forth *infra*.

Then, on November 6, 1952, almost a full year after taxpayer filed for scope amendment, the DPA decided to certify all increased costs up to 85% except that "certification [was] denied * * * with respect to the preparation of site in excess of $1,200,000." In its notice to the taxpayer the DPA said that it was imposing this cost limitation pursuant to Revised Regulation 1 section 4(k) which permitted it to amend "any Necessity Certificate for sufficient cause." Although no cause was expressly stated in the notification, the record indicates that the taxpayer later became aware that the DPA's action was "predicated on the theory that site preparation is in effect the equivalent of cost of land" and therefore not a proper subject for certification. The theory was that the land was acquired at much under its normal price because of the lime, and therefore removing the lime was really a cost of land acquisition. The source of this information is not given, however, and whether it actually formed the basis for the authority's opinion remains conjectural. Taxpayer denied that it was true.

Understandably, the taxpayer was dissatisfied with this decision, since at the time of its receipt it had already spent more than $3,000,000 on site preparation. Consequently, it appealed to the Office of Defense Mobilization (hereinafter ODM) to vacate the DPA's decision. Before its appeal was heard, however, the DPA issued an interpretation of its Revised Regulation 1 (hereinafter referred to as Interpretation) (32A C.F.R. Chap. V, Reg. 1, Int. 2 (Rev. 1953)), set forth so far as pertinent *infra*.

In March 1953, the ODM denied taxpayer's appeal. Despite this reaffirmation of the DPA's cost limitation, the taxpayer claimed, in the disputed tax returns, the right to amortize, in the statutorily prescribed increments, 85% of the *actual* cost of site preparation. This figure as discounted by the percentage limitation amounted to $2,896,463.81, or as taxpayer claimed, a yearly deduction of $579,292.76 for five years. Although the Commissioner, after auditing the returns, was satisfied that the taxpayer had properly identified these costs to site preparation, he nevertheless adhered to the DPA's limitation and denied deductions in excess of 85% of $1,200,000. This partial loss of deduction increased taxpayer's net taxable income, thereby increasing its taxes due. Deficiencies

were assessed and paid; timely claims for refunds were made and refused. We now must decide whether the plaintiff, as successor to the taxpayer, can recover.

Plaintiff rests its refund claim on essentially two theories. First, it argues that under the relevant regulations in force, it was under no duty to file for scope amendment. Thus, it urges us to regard it as a nullity. Assuming that it was necessary to file for scope amendment, plaintiff asserts that the DPA's decision should be set aside because it was *ultra vires,* barred by an estoppel, and arbitrary. Defendant challenges these arguments on all points and for the reasons set forth below we agree with its position.

### I

Taking the issues in order, we must first determine whether taxpayer was required by the regulations in force to file for scope amendment. The premises of plaintiff's argument are these: Taxpayer filed for scope amendment merely out of caution. Since it was not required to do so by any regulation in force, its gratuity should not have served as the basis for a penalty. For had it not been so circumspect, taxpayer could have "run free" to amortize all actually incurred costs by merely identifying them to the site preparation item to the satisfaction of the Commissioner.

The succession of certifying authorities and the concomitant supercession of regulations which occurred during the period of taxpayer's certification necessarily protract our analysis of this issue but do not alter the result.

Predating taxpayer's original application was NSRB's Regulation 1 quoted in part above. Plaintiff asks that in construing the language of Regulation 1 section 3(i), we heed its permissive tenor. Roughly paraphrased, section 3(i) provides that where a taxpayer finds that the description or cost of its facility materially varies from the originally certified description or cost, it *may* file a corrected statement with the certifying authority which, if approved, would serve as an amendment to the certificate binding on the Commissioner. Under this regulation the plaintiff is indeed correct in asserting that even though taxpayer's costs did materially vary, it was not compelled to file for scope amendment. It is incorrect, however, as to the consequences of not filing.

Section 124A(a) of the 1939 Internal Revenue Code allowed taxpayers to amortize the "adjusted basis of any emergency facility." Defining the "adjusted basis" eligible for amortization, section 124A(e) says that it shall include only that portion of the amount necessary for an emergency facility "as such [certifying] authority has certified as attributable to defense purposes." This section further states that "[s]uch certification shall be under such regulations as may be prescribed * * * by such certifying authority." Operating under this mandate the NSRB in Regulation 1 section 3(h) advised taxpayers that although a Necessity Certificate "will constitute conclusive evidence of certification" on the Commissioner, it will only constitute such evidence *"to the extent certified."* (Emphasis supplied).

When read in this context, the half-truth of plaintiff's argument becomes evident. True, section 3(i) *supra,* did not enjoin taxpayer to file for scope amendment, but, from the foregoing, we conclude that without a re-certification of its changed conditions, taxpayer would have not only been hardput to identify *any* costs to the site preparation item not described or explained in its original certification, but also, and more importantly, it would *not* have been able to obtain amortization beyond the extent certified. Hence, the taxpayer could not have "run free" on the original certificate, because the Commissioner was directed by statute and regulation to respect limitations imposed by the certifying authority. Taxpayer's original certificate was limited expressly:

\* \* \* \* \* \*

The facilities to which this certificate relates were estimated by the applicant

to cost $18,000,000 as of the date of the application. Deducting the cost of the land, which is not certified, the net cost estimated by the applicant as of the date of the application *to which the 85% relates was $17,280,000.* (Emphasis supplied).

Alternatively, plaintiff argues that regardless of any interpretion we may give to Regulation 1, its thesis is supported conclusively by Revised Regulation 1 section 4(j) as clarified by Interpretation section (b) (2). Plaintiff urges that these regulations are applicable to this case even though they were promulgated after the taxpayer had filed its request for scope amendment. Assuming that plaintiff is correct as to their applicability, we perceive our views to be strengthened rather than undermined by the specificity of these regulations. To facilitate discussion of this issue we shall state in full the relevant sections of Revised Regulation 1 and the Interpretation.

## REVISED REGULATION 1.

Sec. 4. Procedures and responsibilities.

\* \* \* \* \* \*

(i) *Necessity Certificates.* Upon approval of an application, a Necessity Certificate will be forwarded to the Commissioner of Internal Revenue and will constitute conclusive evidence of certification by the Certifying Authority that the facilities therein described are necessary in the interest of national defense and of the portion of the adjusted basis upon which the amortization deduction under section 124A(a) shall be computed. The Certifying Authority will not certify the accuracy of the cost of any facility nor of any date relative to the construction, \* \* \* thereof. It will be incumbent upon taxpayers electing to take the amortization deduction to establish to the satisfaction of the Commissioner \* \* \* the identities of the facilities, the costs thereof, and the dates relative thereto.

(j) *Further description after certification.* (1) Where the actual description or cost of a certified facility varies or will vary so materially from the description or cost in the application for certificate as to put in question the identity of the facility, the taxpayer may request an amendment of the certificate by filing a statement with the Certifying Authority setting forth the revised description or cost.

\* \* \* \* \* \*

(3) If the Certifying Authority is of the opinion that the varied or changed costs or descriptions are within the scope of the original certification, the amended Appendix A [description and cost sheet] will be forwarded by the Certifying Authority to the Commissioner \* \* \* for substitution for the original Appendix A attached to the original certificate to have the effect of an amendment thereof \* \* \*.

## INTERPRETATION.

\* \* \* \* \* \*

(b) It is to be considered that there is not so material a variation as to put in question the identity of the facility and therefore that the varied description or cost is within the scope of the original certification and *no amendment is necessary in the following cases.* (Emphasis supplied.)

(1) *Where the facility acquired or constructed is the same as that certified even though the actual cost exceeds the cost of the facility as estimated in the certificate.* Such increased cost may arise from increases in materials or labor, or from other factors. (Emphasis in original.)

(2) *Where the facility acquired or constructed varies from the facility certified and the actual costs exceeds by not more than 15 percent the cost estimated in the certificate.* The variations contemplated increases in area, size or capacity; acquisitions from a manufacturer or construction by a builder other than the one set forth in the certificate; additional attachments or spare parts; or variations

in construction. (Emphasis in original.)

Plaintiff asserts that although taxpayer's originally estimated costs, because of soaring labor and materials prices, had increased by more than 15%, the identity of its facility did not so materially vary as to be put in question. Therefore under Interpretation section (b) (1) it was excused from filing for scope amendment. Plaintiff acknowledges the direction of section (b) (2) but insists that it is inapplicable since it only operates where there is a material variation to the facility *as a whole*. Since taxpayer never enlarged its bank of coke ovens, the facility as a whole, beyond the certified number, the identity of the facility remained unchanged despite the variation to one of its components—the preparing site.

With only the record before us, we admit that if plaintiff's reading of section (b) (2) is correct then its argument that the taxpayer could have "run free" on the original certificate gains currency. Section (b) (2) does admit the interpretation that where the facility is not put in question, or is in question but the increased cost does not exceed the original estimate by more than 15%, the Commissioner, unlike in Regulation 1 section 3(i), is directed to allow amortization for all costs identified to that facility regardless of the originally certified estimate. We need not decide this question, however, since we find plaintiff's reading of section (b) (2) to be erroneous.

In determining what the taxpayer *sought to have certified* as an emergency facility and for that matter what the certifying authority thought it had designated as such, we must attach great significance to the statements made in the original application. Appendix A of the form application provided a section in which taxpayers were to list each item to be certified. As stated previously, taxpayer requested certification for land, buildings and other fixed installations, and other miscellaneous items. It is important to note that in describing its "fixed installations" the taxpayer listed "preparing site" as a separate item from the 75 by-product coke ovens. It is therefore reasonable to infer that the NSRB recognized "preparing site" as a fixed installation and certified it separately as an emergency facility. The interpretation is itself thus to be interpreted as meaning a 15% increase in the cost of any such separately stated item. Plaintiff's own description of the "preparing site" item, although taken from another context in its brief, is consistent with this inference: "The original amount was admittedly too low as to many of the facilities, including the 'preparing site', but all of the facilities involved were nevertheless certified as 'Emergency' to the extent of 85%." Hence we conclude that despite any later developed policies the preparing site item was initially certified as an emergency facility, and therefore, under section (b) (2) any material variation which put its identity in question required the filing of a scope amendment. Since a 50% increase in the site was such a material variation, and since site preparation costs increased by more than 15%, we find that for the reasons given in our consideration of Regulation 1 section 3 (i), the taxpayer for its own benefit would have been "compelled" under these regulations to file for scope amendment. (Emphasis supplied).

Moreover, taxpayer in submitting its scope amendment and inviting the attention of the DPA to it, did not say it was performing a futile act out of an excess of caution. The DPA considered the amendment on the merits. So far as the regulation is ambiguous, if it is, this represented a contemporaneous construction of it by both parties. It is not to be supposed that the DPA took up the heavy burdens involved in passing on this amendment, while simultaneously considering it useless and needless to do so. It allowed taxpayer's cost increases for other items, and taxpayer we suppose has taken amortization deductions based on these allowances.

## II

We next turn our attention to plaintiff's second argument that the DPA's decision for various reasons should be set aside. Plaintiff's first contention in this context is that the DPA's decision was *ultra vires* for once the NSRB had ascribed certification and set the amortization percentage at 85, the DPA was without authority to reduce this percentage with a cost limitation. Underlying this contention is plaintiff's proposition that certifying authorities were meant to certify *facilities* and that the amortization percentages applied to actual cost of the facility and were not limited to any estimated cost.

We find this contention to be wholly unfounded. That certifying authorities were intended to be irrevocably committed to an initial certification and all its provisions is refuted by the express language of the governing regulation: Section 3(j) of Regulation 1 reads as follows:

> *Cancellation or amendment of Necessity Certificate.* The certifying authority may (1) cancel any Necessity Certificate where it has been obtained by fraud or misrepresentation or has been issued through error or inadvertence, or (2) amend any Necessity Certificate for sufficient cause shown.

Moreover, this power was reaffirmed by the DPA and reiterated verbatim in section 4(k) of its Revised Regulation 1 which expressly served as the basis for the disputed decision. (This reliance on section 4(k) was perhaps misplaced, since it is arguable that the DPA did not amend the original certificate but in fact merely refused to amend it to the full extent the taxpayer desired. This minor procedural point is unimportant, however, since if the DPA had the authority to amend or cancel certificates, *a fortiori* it was empowered to limit amendments to original certificates.) Plaintiff's reasoning is also at war with the Supreme Court's decision in United States v. Allen-Bradley Co., *supra*; *accord*, National Lead Co. v. Commissioner of Internal Revenue, 352 U.S. 313, 77 S.Ct. 347, 1 L.Ed.2d 352 (1957) which clearly admonishes us against imposing inflexible standards on these certifying authorities, and gives excellent reasons for not doing so.

While these cases on their facts dealt with percentage limitations, the Court says in *Allen-Bradley*, 352 U.S. at p. 311, 77 S.Ct. at p. 348, that the authority can certify "only a part of the cost," language broad enough to cover a limit stated as a dollar amount.

Second, plaintiff argues that for the following reasons the DPA's decision is barred by an estoppel: The NSRB's prompt certification of 85% of costs known to be only rough estimates, naturally misled the taxpayer into believing that all expenditures in excess of these estimates would be amortizable until a further notice (which implicitly was to operate prospectively). That the DPA did not immediately respond to its request for scope amendment was understood by the taxpayer to mean that all was well. Reasonably relying on these impressions, taxpayer, during the one year interim between the request for amendment and the decision, spent over $3,000,000 on site preparation. Consequent to this reasonable reliance it suffered substantial detriment in the loss of tax deductions.

We can not agree with plaintiff's position. In the light of Regulation 1 section 3(j), *supra*, and Revised Regulation 1 section 4(k), *supra*, the taxpayer could not have reasonably believed that on the basis of its ill-defined original application, its certification was somewhat inviolate. Granted, had taxpayer filed for certification after the issuance of the Interpretation, one could argue that on the basis of section (b)(1) it was reasonable to assume that a certification was limitless provided the facility remained unchanged. But this regulation has no affect on our analysis since we must consider taxpayer's assumptions in the context of regulations in force at the time it made its decision to proceed with site preparation. Moreover, turning to the

face of the original certification, we find nothing there that would indicate to the taxpayer that its facilities were being certified independent of cost. On the contrary, the certificate expressly states that "the net cost estimated by the applicant as of the date of this application *to which the 85% relates was $17,280,000*" —the estimated cost of the entire project without the land. It was not to be supposed the NSRB gave a cost figure to the IRS for no purpose. Defendant apparently thought it was estopped up to $1,200,000 but we cannot say the figure should have been larger. (Emphasis supplied).

■ Third, plaintiff argues that the DPA's decision was arbitrary in that it unreasonably approved cost increases for all items but site preparation. Since the coke ovens were certified as an emergency facility, plaintiff submits that it was unfair to refuse full amortization benefits to site preparation, a necessary component to the coke ovens, and therefore also a necessary project in the interest of national defense.

This argument is merely a naked allegation of arbitrariness and just to say it, is insufficient to support a claim seeking recovery on that basis. Liotta v. United States, 174 Ct.Cl. 91 (1966); Batchelor v. United States, 169 Ct.Cl. 180 15 cert. denied, 382 U.S. 870, 86 S.Ct. 147, 15 L.Ed.2d 109 (1965). Plaintiff does attack the merits of the DPA's decision but we are unable to review it on that basis. United States v. Allen-Bradley, *supra*.

### III

Defendant also says that the involved site clearance costs are not amortizable. Plaintiff takes issue. Defendant's reasoning is: (a) that such costs, in the absence of statutory amortization, are not depreciable for tax purposes, and (b) that the legislative history shows that Congress intended to authorize amortization only for depreciable costs, that is, it was to be used in lieu of depreciation only. We think it unnecessary to go into this. A conclusion about it would not affect the result in this case. Apparently DPA was coming to somewhat the conclusion that defendant urges now, and but for apparently, some vague notion of estoppel, it would not in the end have allowed anything for site clearance. This cannot, however, be elevated into a reviewable error of law. It is not clear they did not come to this view on policy grounds. The NSRB and DPA could, legally, no doubt, have issued certificates totalling many times the amounts they should have issued in the exercise of their sound discretion. If they had a preference for certificates covering depreciable items, as one of their screening criteria, it was not unreasonable, as they would thereby limit the damage they would cause to the revenue. And on the facts, there was here a doubt whether the so-called site clearence costs were not actually land acquisition costs (already held unallowable) in disguise.

Plaintiff's motion for summary judgment is denied. Defendant's crossmotion is allowed. The petition is dismissed.

COLLINS, Judge (dissenting).

I respectfully dissent from the opinion of Judge Nichols on two grounds. First, I do not agree with the court's interpretation of either Regulation 1, section (3) (i), or Revised Regulation 1, section 4(j), as clarified by Interpretation sections (b) (1) and (b) (2). Regulation 1, section (3) (i), does not require the filing of a scope amendment where the description or cost of a facility, that has already been certified, materially varies from the actual description or cost of the facility when it is completed. Instead, the filing of such an amendment is merely permissive with the taxpayer. When the taxpayer elects to file an amendment, a copy will be forwarded to the Commissioner of Internal Revenue, provided the description or cost is within the scope of the original certification. In addition, it is stated in section (3) (h) that a Necessity Certificate constitutes conclusive evidence of certification that the facilities described therein are necessary in the interest of national defense to the extent

certified, and that the accuracy of the cost of a facility is not being certified but rather must be established by the taxpayer, himself, to the satisfaction of the Commissioner of Internal Revenue. When these two sections are read in conjunction with each other, it appears to be evident that the purpose of allowing an amendment is simply to aid the taxpayer in establishing the changed description or increased cost before the Internal Revenue Commissioner. Furthermore, section (3) (h) expressly states that once a facility is properly certified as being necessary in the interest of national defense, then this determination is conclusive upon the certifying authority *to the extent certified*. Since I believe that certification is directed mainly to facilities and not cost, once an item is certified to a specific percent, then the full cost of that item is certified to that percent and not just the percent of the original estimate. In the instant case, the item "preparing site" was certified to the extent of 85 percent of cost and not just to the extent of 85 percent of $1,200,000, which was merely an estimate to which the plaintiff should not be eternally bound. Based on section (3) (h) this 85 percent certification is conclusive upon the certifying authority, thus precluding it from taking the sort of action which was taken in this case, when the plaintiff was denied his full 85 percent of cost. Under this court's interpretation of Regulation 1, section (3) (i), the taxpayer is obliged to obtain recertification anytime there is a changed condition. I do not feel that this interpretation is correct either from a strictly literal approach or from a practical point of view.

The court's reading of Revised Regulation 1, section 4(j), as clarified by Interpretation sections (b) (1) and (b) (2), is likewise subject to attack. In my opinion, the term "facility" as used in (b) (1) and (b) (2) was not meant to apply to each of the various items listed in the original request for certification composing the entire emergency project. Indeed, as I read (b) (1) and (b) (2),

they were intended to apply to the facility *as a whole*, which in the present case would be the battery of coke ovens. Under this interpretation, the increase in the size of the land would not be "so material a variation as to put in question the identity of the facility." Consequently, section (b) (1) would be applicable to this case since the facility (the coke ovens) would still be the same despite the increase of actual costs over estimated costs. In addition, this interpretation of sections (b) (1) and (b) (2) lends support to my earlier interpretation of Regulation 1, section (3) (i), in that under neither section is the taxpayer required to file an amendment in all cases where there is a change in description or cost.

I conclude, therefore, that plaintiff was not required to file a scope amendment regardless of whether Regulation 1, section (3) (i), or Revised Regulation 1, section 4(j), is held to apply. It was, therefore, improper for the certifying authority to deny plaintiff its full cost of "preparing site" as the result of plaintiff's filing of a scope amendment, which was simply a precautionary move.

It is indeed interesting to note that the record reveals that the certifying authority in this case refused to certify plaintiff's full cost of preparing site because it considered site preparation, in effect, to be the equivalent of the cost of land. If this is true, it is an absurd reason because the preparation of site has nothing to do with the cost of land. Since the authority relied on Revised Regulation 1, section 4(k), for its authority in making this decision, it must show fraud, misrepresentation, or sufficient cause. Certainly, there is no indication at all of fraud or misrepresentation, and I cannot agree that connecting site preparation with cost of land is a sufficient or even a correct reason for an amendment.

The second ground for my dissent is that I do not agree with the court's resolution of the estoppel question. Since one of the bases for the court's disposition of plaintiff's estoppel argument is

its earlier interpretation of Regulation 1, section (3) (i), and Interpretation (b) (1), neither of which I concur with, I likewise cannot now agree with the court's treatment of this particular issue. Based on Regulation 1, sections (3) (h) and (3) (i), the plaintiff had every reason to feel certain that the full cost (up to 85 percent) of its facility, including the item "preparing site," was being certified. Furthermore, I am unable to comprehend the court's reliance on Regulation 1, section 3(j), and Revised Regulation 1, section 4(k), in light of the fact that there was nothing to indicate to plaintiff that the certifying authority would have good cause to amend its certificate. Consequently, plaintiff's reliance on the validity of its certificate was well founded. Since there was this reasonable reliance by plaintiff and since plaintiff was thereby detrimentally affected by the inexcusable delay of the certifying authority, I feel that defendant should be estopped from asserting the validity of the decision of the DPA not to certify the full cost of the preparing site item.

For the reasons stated in this dissent, plaintiff's motion for summary judgment should be granted, and defendant's motion for summary judgment denied.